IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Essex Insurance Co., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 06 C 1078 |
| Supreme Transportation, Inc., Met Logistics, Inc. and St. Paul Fire and Marine Insurance Company, | ) Judge Virginia M. Kendall |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

On or about July 17, 2005, sixteen pallets of Hewlett-Packard laptop computers were stolen from the premises located at 1300 Michael Drive, Suite B, Wood Dale, IL ("the Premises"). Plaintiff Essex Insurance Company ("Essex") issued a policy to Supreme Transportation, Inc. ("Supreme") for the Premises. Essex now moves for a judgment declaring that Supreme breached the conditions of the insurance policy by failing to properly maintain its burglar alarm system at the Premises. Alternatively, Essex asks for a declaration that the insurance policy is void because of material misrepresentations made in Supreme's application for coverage. For both reasons, Essex ultimately seeks a declaration that it is relieved of any obligation to defend or indemnify any of Defendants for any loss arising from the theft on Supreme's premises. Because there is insufficient undisputed evidence regarding Supreme's practice of maintaining the alarm system when the Premises were unoccupied, genuine issues of material fact exist as to whether Supreme breached the conditions of the insurance policy or made a material misrepresentation in its application for insurance.

**Statement of Facts**

Supreme has operated as an expedited trucking company and warehouseman at the Premises since approximately August of 2003. (Plf. ¶ 27.)[1] The building at 1300 Michael Drive contains three suites. (Plf. ¶ 28.) In July 2005, Supreme leased Suite B and the adjacent suite, Suite G. (Plf. ¶ 46.) During that time, Supreme subleased Suite G to MARX's Transportation and Express Freight and rented space in Suite B to American Line Haul. (Plf. ¶ 59.) Supreme operates out of its space twenty-four hours a day, seven days a week from approximately 8:00 p.m. Sunday night through 5:30 p.m. the following Sunday night. (Plf. ¶ 30.) During the remaining two-and-a-half hour window on Sunday night, the Premises are unoccupied. (Plf. ¶ 24.)

In 2003, Supreme contracted with ADT to install a burglar alarm system at the Premises. (Def. ¶ 4.)[2] The burglar alarm utilized motion detectors near the dock doors and a contact device on the office door. (Def. ¶ 5.) The westerly wall dividing Supreme's space from Suite G includes a large, metal, roll up door which was not wired with the ADT burglar alarm. (Plf. ¶ 29.) It was Supreme's practice to have the burglar alarm turned off while the premises were occupied. (Plf. ¶ 18.) On the evening of the theft, the last employee, Marcin Burcyzc, purportedly left Suite B around 4:30 p.m. (Plf. ¶ 26.) Mr. Burcyzc did not turn on the alarm and, at the time of the theft, the alarm was turned off. (Plf. ¶¶ 19-20; Def. ¶ 9.) Supreme first became aware of a possible theft at approximately 11:00 or 11:30 a.m. the following day, Monday, July 18, 2005. (Plf. ¶ 31.) The stolen laptop computers belonged to Met Logistics, Inc. ("Met").[3] (Plf. ¶ 14.)

---

[1] Supreme's Response to Essex's Local Rule 56.1 Statement.

[2] Supreme's Local Rule 56.1(b)(3)(C) Statements of Additional Facts.

[3] In satisfaction for the loss of the laptop computers, St. Paul Fire and Marine Insurance Company ("St. Paul") allegedly paid Met the sum of $553,497.84 and thereby became subrogated

The president of Supreme, James Lumley, signed a Warehouseman Liability Insurance Proposal on March 8, 2004. (Plf. ¶ 8; Compl., Ex. A.) The Proposal sought insurance coverage from Essex for the Premises. (Compl., Ex. A.) Bill Hunt of Trio Insurance Agency prepared the Proposal that James Lumley signed. (Def. ¶¶ 21-22.) Supreme gave the following answers in The Proposal:

6. PROTECTION OF PREMISES

    c. (1) Are your premises protected by an operating Premises Alarm System? yes

        Central Station? yes

(Plf. ¶ 8; Compl., Ex. A.) Based on the Proposal, Essex issued Warehouseman Liability Insurance Policy No. 1MD6675 - 0 ("the Policy") to Supreme. (Plf. ¶ 9; Compl., Ex. B.) The Policy included a Protective Safeguards Endorsement which states that:

> In consideration of the premium at which this policy is written, based on the protection of the premises by the protective safeguard system or systems indicated below, it is a condition of this policy that the insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the system which are under the control of the insured, including any special maintenance or service requirements indicated below. It also is a condition of this insurance that the insured shall give immediate notice to this Company or [sic] any impairment in or suspension of any equipment or service pertaining to the system within the knowledge of the insured.

(Plf. ¶ 10.) The "protective safeguard system or systems indicated below" were an automatic sprinkler system; automatic fire alarm, reporting to a public or private fire alarm station; and an automatic burglar alarm, reporting to a public or private burglar alarm station. (Plf. ¶ 11; Compl. Ex. B.) The Endorsement states in large, bold text that "[f]ailure to comply with the Protective

---

to the rights of Met. (St. Paul's Cross-Claim Against Supreme ¶¶ 12-13.)

Safeguard Clauses specified as applicable in the Schedule below shall suspend this insurance." (Plf. ¶ 12.)

**Standard of Review**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, a court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted"). An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

**Discussion**

Illinois law governs the construction of the insurance policy that Essex issued to Supreme. *See Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842, 845 (Ill. 1995). Under Illinois law, the construction of an insurance policy is a question of law. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (1992). A court's goal in construing a policy is the

same as interpreting any contract – to give effect to the parties' intent. *Id.* The best evidence of that intent is the language of the contract itself. *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. 2006). When the terms of an insurance policy are unambiguous – susceptible to just one reasonable interpretation – a court will not look to extrinsic evidence and "must afford them their *plain, ordinary, and popular meaning.*" *Id.* (emphasis in original); *see T.H.E. Insurance Co. v. Chicago Fireworks Manufacturing Co.*, 724 N.E.2d 188, 192 (Ill. App. 1999) ("When an insurance contract is unambiguous, the court must not consider any evidence beyond the four corners of the policy for construing the contract"). Any ambiguous terms, however, are construed in favor of the insured and against the insurer. *Id.*

Essex advances two related arguments as to why it should not be obligated to cover any loss resulting from the theft of the laptop computers: (1) under the terms of the policy, insurance coverage was suspended because Supreme did not exercise due diligence in maintaining its burglar alarm in complete working order and (2) Supreme misrepresented in its application for insurance that an alarm system protected the Premises.

**I.     Terms of the Policy**

The Policy's Protective Safeguards Endorsement states that unless Supreme exercises due diligence in maintaining the automatic burglar alarm in complete working order, insurance coverage will be suspended. (Plf. ¶¶ 10, 12.) Supreme argues that it did not violate the terms of the Endorsement because (1) it never received a copy of the policy; (2) there is no evidence regarding Essex's expectations of how the alarm system should be maintained; and (3) Supreme did not fail to exercise due diligence in maintaining the alarm system.[4] Essex bears the burden of establishing

---

[4] Supreme does not challenge Essex's contention that the language "maintain in complete working order" includes the requirement to turn on the alarm. *See Certain Underwriters at Lloyd's*

5

that Supreme did not exercise due diligence in maintaining the alarm system. *See Sears, Roebuck and Co. v. Acceptance Ins. Co.*, 793 N.E.2d 736, 740 (Ill. App. 2003) ("The insurer bears the burden of establishing that a claim falls within a provision that limits or excludes coverage").

Supreme repeatedly contends that because it did not receive a copy of the Policy until after the theft occurred, the terms of the Endorsement cannot be enforced against it. (Def. ¶ 23.) Trio Insurance Agency was the retail agent responsible for purchasing insurance for Supreme. (Def. ¶ 21.) Copies of the Policy and the endorsements were sent to Trio Insurance Agency on April 13, 2004 and May 6, 2005 as well as stamped originals of the Policy and endorsements on May 13, 2004 and August 15, 2005. (Affidavit of Sharon Crone, ¶¶ 3-6.) The cover letter included with each Policy stated: "[p]lease review the enclosed document(s) carefully to make certain that the terms and conditions are as agreed upon." (Crone Aff., Exs. A-D.) Because Trio was acting as Supreme's agent in securing insurance, providing the policies to Trio was sufficient to put Supreme on notice of the terms of the Policy and its endorsements. *See, e.g., Wabash Properties Inc. v. Transport Indemnity Co.*, 1985 WL 2452 at *3 (N.D. Ill. 1985) (finding protective safeguard endorsement applicable where insured's insurance agent had knowledge of the provision); *see City of Burbank v. Illinois State Labor Relations Bd.*, 541 N.E.2d 1259, 1264 (Ill. App. 1989).

Essex bears the burden of establishing that there is no genuine issue of material fact regarding Supreme's policy or practice in maintaining the alarm system and that no reasonable jury could find, based on undisputed facts, that Supreme exercised due diligence to maintain the burglar alarm system in complete working order. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

---

*London v. The Warehouse, Inc.*, 2002 WL 31890931 at *4 (E.D. La. 2002) ("[T]he Court reaches the inescapable conclusion that the term 'maintain,' surely contemplates that Warehouse would set and use the alarm").

Supreme argues that it exercised the diligence customary in the industry. Supreme's President avers that it is customary not to have an alarm turned on while business is being conducted. (Def. ¶¶ 5-7.) He does not state, however, that it is customary not to turn on an alarm system when a company is not conducting business and its premises are unoccupied. Indeed, no rational jury could find that Supreme exercised the due diligence required by the Policy's Endorsement if it did not have a regular practice of turning on the alarm system when the Premises were unoccupied. *See Matusek Academy of Music, Inc. v. National Surety Corp.*, 210 F.2d 333, 337 (7th Cir. 1954) (policy exclusion clause applied where burglar alarm was not in proper working order when none of insured's employees were not present and premises were not open for business). On the other hand, if July 17, 2005 was a one time incident, a rational jury could find that although the alarm was turned off at the time of the theft, Supreme substantially complied with the Protective Safeguards Endorsement. *See Burmac Metal Finishing Co. v. West Bend Mutual Insur. Co.*, 825 N.E.2d 1246, 1250-51 (Ill. App. 2005) (finding question of fact as to whether plaintiff substantially complied with policy condition to maintain sprinkler system when it disabled 3 to 13 sprinklers out of over 600); *SFI, Inc. v. United States Fire Insurance Co.*, 453 F. Supp. 502, 507 (M.D. La. 1978) (due diligence standard could be met where unset alarm was a one-time negligent act that happened to occur on the very night the burglary took place).

There is scant evidence in the summary judgment record as to whether the failure to turn on the alarm on July 17 was part of Supreme's practice or whether it was an isolated incident of negligence by Marcin Burcyzc. Essex points out that Supreme does not have any manuals, correspondence, notes or memos regarding the security system itself or its own security procedures or policies at the Premises. (Plf. ¶¶ 17, 62.) Responding, Supreme's president, Lumley, states that the "alarm should have been turned on when [the last employee] left." (Def. ¶ 9.) Lumley's

statement can be given no weight though since he does not provide any foundation for his conclusion. *See* F.R.C.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge"); Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). Finally, twice during Kurt Zimny's 30(b)(6) deposition, he was asked when the alarm system was turned on. On both occasions, Zimny answered that there was no reason to turn on the alarm system because there was always somebody in the building. (Zimny Dep. pp. 66, 68.) In this way, Zimny never directly answered whether the alarm was turned on when the Premises were unoccupied.

Dispositive of its Motion for Summary Judgment is the fact that Essex has the burden of proving the Endorsement's limitation on coverage. The undisputed evidence is that Supreme did not turn on the alarm system when the Premises were occupied and did not have the alarm wired to the metal, roll-up door separating Suites B and G. While Zimny's answers and Supreme's arguments raise the strong *inference* that the alarm was never turned on, there is no definite answer in the record as to when or if Supreme turned on the alarm. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson*, 477 U.S. at 255. If the jury found that Essex did not prove that Supreme failed to turn on the alarm when it left the Premises unoccupied, it could reasonably conclude that Supreme substantially complied with the Policy's terms. *See Burmac Metal Finishing*, 825 N.E.2d at 1250-51; *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) ("Summary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact"). Thus, given Essex's burden, the lack of evidence regarding Supreme's practice of maintaining the alarm system when the Premises were unoccupied precludes judgment as a matter of law that Supreme violated the conditions of the Endorsement.

## II. Misrepresentation

In its application for insurance, Supreme represented that the Premises were protected by an operating alarm system. Section 154 of the Illinois Insurance Code provides that:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance * * * shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.

215 ILCS 5/154. Illinois courts apply § 154 as a two-prong test to determine if a policy is void: "the statement must be false and the false statement must have been made with an intent to deceive or must materially affect the acceptance of the risk or hazard assumed by the insurer." *Golden Rule Ins. Co. v. Schwartz*, 786 N.E.2d 1010, 1015 (Ill. 2003). Essex contends that Supreme falsely represented in its application for insurance that the Premises were protected by an operating alarm system and that Supreme's representation both materially affected Essex's acceptance of the risk and the risk of loss that Essex assumed. Supreme responds that Essex has presented no evidence that there would have been either a difference in premium or a refusal to insure based on a failure to arm the alarm during the roughly two-and-a-half-hour period each week that the Premises were unoccupied.

As evidence that the working alarm system was a material term of the Policy, Essex points to the language of the Policy itself. In particular, the Policy states that "[i]n consideration of the premium at which this policy is written," Supreme agrees to exercise due diligence in maintaining the alarm system in complete working order. Arguably, this statement alone establishes that a working alarm system was material to Essex's decision to issue the Policy and, specifically, to issue

9

the Policy at the given premium. *See Small v. Prudential Life Ins. Co.*, 617 N.E.2d 80, 83 (1993) (a misrepresentation is material if "reasonably careful and intelligent persons would regard the facts as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application"); *see also Matusek*, 210 F.2d at 337 (citing evidence that the "[t]he premium for policies without such [a burglar alarm] clause . . . would each have cost 25% higher"). A genuine issue of fact exists, however, as to whether Supreme's representation that its Premises were protected by the alarm system was false. Similar to the breach of contract analysis, if Supreme were to establish that it had a regular practice of turning on the alarm system when the Premises were unoccupied, a reasonable jury could find that Supreme's representation that it had a working alarm system was accurate.

**Conclusion and Order**

Essex has not established through undisputed facts that Supreme did not exercise due diligence in maintaining the alarm system or misrepresented that the Premises were protected by an alarm system. Wherefore, Essex's Motion for Summary Judgment is denied.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: July 12, 2007